**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 30, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DEFENDERS OF WILDLIFE;
WYOMING WILDLIFE ADVOCATES,

    Plaintiffs - Appellants,

v.

MARGARET EVERSON,[*] Director,
National Park Service; MICHAEL T.
REYNOLDS,[*] Director, National Park
Service Intermountain Region; UNITED
STATES DEPARTMENT OF
INTERIOR; DAVID L. BERNHARDT,[*]
in his official capacity as Secretary of
the Department of the Interior,

    Defendants - Appellees,

and

STATE OF WYOMING,

    Intervenor Defendant - Appellee.

No. 18-8061

---

    [*]    On August 7, 2020, Margaret Everson became the Acting Director of the National Park Service, and her name therefore has been substituted for that of Jonathan Jarvis. On October 23, 2019, Michael T. Reynolds became the Director of the National Park Service's Intermountain Region, and his name therefore has been substituted for that of Sue Masica. On April 11, 2019, David L. Bernhardt became the Secretary of the Department of the Interior, and his name therefore has been substituted for that of Ryan Zinke. These substitutions are in accordance with Federal Rules of Appellate Procedure 43(c)(2).

_____

NATIONAL PARKS
CONSERVATION ASSOCIATION;
GREATER YELLOWSTONE
COALITION,

     Plaintiffs - Appellants,

v.

UNITED STATES DEPARTMENT
OF INTERIOR; NATIONAL PARK
SERVICE,

     Defendants - Appellees,

and

STATE OF WYOMING,

     Intervenor Defendant - Appellee.

No. 18-8062

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:16-CV-00306-SWS)**

---

Timothy J. Preso, (Katherine K. O'Brien, Earthjustice, Bozeman, Montana with him on the briefs) for Defenders of Wildlife and Wyoming, Wildlife Advocates, Plaintiffs-Appellants.

Robert D. Rosenbaum, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for National Parks Conservation Association, Greater Yellowstone Coalition, the Plaintiffs-Appellants.

Kevin W. McArdle, Environment and Natural Resources Division, Washington, D.C., (Jeffrey Bossert Clark, Assistant Attorney General, Eric Grant, Deputy

2

Assistant Attorney General, Ellen J. Durkee, Judith E. Coleman, Environment and Natural Resources Division, Washington, D.C., and Tyson Powell, of Counsel, Office of the Regional Solicitor U.S. Department of the Interior, Lakewood, Colorado with him on the brief) for Federal Defendants-Appellees.

Erik E. Petersen, Senior Assistant Attorney General of Wyoming, (James Kaste, Deputy Attorney General, with him on the brief) Office of Attorney General, Cheyenne, Wyoming, for the State of Wyoming, Intervenor Defendant-Appellee.

---

Before **LUCERO**, **HOLMES**, and **MORITZ**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Grand Teton National Park (the "Park") is an iconic landscape of the American West, renowned for its regal mountains and picturesque vistas. Situated in northwestern Wyoming, it encompasses a sprawling 310,000 acres of land, over ninety-nine percent of which is owned by the federal government. The remaining roughly one percent of that land is owned by either the State of Wyoming or private parties.

At the heart of this case is governmental jurisdiction over that one percent of state- and privately owned land within the Park's exterior boundaries—what are collectively called "inholdings." In these two consolidated appeals, we must resolve administrative challenges to two actions taken by Defendant-Appellee

3

National Park Service ("NPS")[1] regarding the management of wildlife on the Park's inholdings.

The first agency action at issue is challenged by all of the above-captioned appellants: Defenders of Wildlife and Wyoming Wildlife Advocates (collectively, "Defenders") in Case No. 18-8061, and the National Parks Conservation Association and the Greater Yellowstone Coalition (collectively, the "Conservation Association," and together with Defenders, the "Appellants") in Case No. 18-8062. Specifically, the Appellants challenge NPS's 2014 determination that 36 C.F.R. § 2.2—a wildlife regulation that, by and large, prohibits hunting in national parks—does not apply to the Park's inholdings, based on what NPS had concluded was its lack of jurisdiction over wildlife management on those lands. The Appellants contend that NPS does possess such jurisdiction, and that its determination otherwise was contrary to law and arbitrary and capricious under the Administrative Procedure Act (the "APA").

The second agency action is challenged only by the Conservation Association. It concerns the Joint Elk Reduction Program (the "Elk Reduction

---

[1]  For simplicity's sake, we employ "NPS" as a catchall that collectively refers to the following parties in this case: NPS; the United States Department of the Interior; David L. Bernhardt, Secretary of the United States Department of the Interior, in his official capacity; Margaret Everson, Acting Director of the NPS, in her official capacity; and Michael T. Reynolds, Director of the NPS Intermountain Region, in his official capacity.

4

Program")—a plan under the joint auspices of NPS and the State of Wyoming aimed at controlling the Park's elk-herd population. Specifically, the Conservation Association challenges NPS's approval in 2015 of a change to the program's boundary that removed a certain privately owned tract of land, *viz.*, an inholding, from the program. NPS's approval of this change was based on its determination that it did not have jurisdiction over the inholding. The Conservation Association contests NPS's decision as contrary to law and arbitrary and capricious under the APA.

The district court rejected both challenges to the two NPS actions. It found, as an initial matter, that the Appellants possessed standing to challenge both actions. Ultimately, however, it held that they had failed to show that either of the contested actions was contrary to law or arbitrary and capricious, and therefore affirmed NPS's actions in full. This appeal followed.

First, we hold that NPS's determination that 36 C.F.R. § 2.2 does not apply to Park inholdings was *not* contrary to law or arbitrary and capricious. We further hold that the Conservation Association lacks standing to challenge NPS's approval of the 2015 Elk Reduction Program. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, and for the reasons stated below, we **affirm** the district court's judgment as to NPS's § 2.2 determination. Furthermore, we **dismiss** the portion of the appeal pertaining to NPS's approval of the 2015 Elk

5

Reduction Program, and **remand** with instructions to **vacate** that portion of the judgment and dismiss the Conservation Association's claim thereof without prejudice.[2]

# I

We begin by laying out the necessary background. We do this in four steps. *First*, we offer an overview of the applicable legal framework. *Second*, we trace the salient aspects of the Park's history, recounting its genesis and its evolution into the park that we know today. *Third*, against this historical backdrop, we detail the two administrative actions that immediately gave rise to this appeal. *Fourth*, we summarize the procedural history of this case.

## A

### 1

NPS's authority is derived from the National Park Service Organic Act. Under that statute, Congress has directed NPS to "promote and regulate the use of the National Park System by means and measures" that "conserve [and] . . . provide for the enjoyment of the scenery, natural and historic objects, and wild

---

[2] In addition to the foregoing merits issues, there are two pending ancillary matters before this court. First, the Conservation Association has filed a motion seeking leave to file a supplemental appendix. Second, the Conservation Association has filed a motion for leave to file a reply to a letter by NPS and Wyoming, pertaining to several 28(j) submissions in this action. We **deny** both motions.

life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

To carry out this mandate, NPS promulgates regulations, which are codified at Title 36 of the Code of Federal Regulations. One such regulation that NPS promulgated—and the regulation centrally at issue here—is 36 C.F.R. § 2.2, which generally prohibits the "taking" of wildlife in national parks. 36 C.F.R. § 2.2(a)(1); *see id.* (enumerating various activities that "are prohibited," including "[t]he taking of wildlife"). "Taking," in turn, "means to pursue, hunt, harass, harm, shoot, trap, net, capture, collect, kill, wound, or attempt to do any of the above." *Id.* § 1.4(a).

With respect to its scope, § 2.2 contains an important limitation. Specifically, § 2.2 applies "regardless of land ownership, on all lands and waters within a park area *that are under the legislative jurisdiction of the United States*." *Id.* § 2.2(g) (emphasis added). That is to say, § 2.2's prohibition on hunting and trapping of wildlife applies to national park lands and waters, *provided that* those lands and waters are under the United States's legislative jurisdiction. By logical corollary, then, § 2.2's takings prohibition does *not* apply on those national park lands and waters that are *not* under the United States's legislative jurisdiction. We now turn to elucidating the core concept of "legislative jurisdiction."

7

"Legislative jurisdiction" refers to "the authority of a state to make its law applicable to persons or activities." *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435 (4th Cir. 1999) (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting)); *accord* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW pt. IV, intro. note (AM. LAW INST. 1987), Westlaw (database updated Oct. 2020) (describing "jurisdiction to prescribe" as "the authority of a state to make its substantive laws applicable to particular persons and circumstances" and noting that "[s]ince jurisdiction to prescribe was seen principally as a function of national legislation, it was sometimes referred to as legislative jurisdiction"); *see United States v. Prado*, 933 F.3d 121, 133 (2d Cir. 2019) ("Legislative, or prescriptive, jurisdiction concerns itself with the reach of a nation's (or any political entity's) laws."); RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 60 cmt. b (AM. LAW INST. 1934), Westlaw (database updated Oct. 2020) ("Legislative jurisdiction in the United States is ordinarily exercised by Congress, a State legislature, or the legislative body of a municipal corporation."); David P. Granoff, *Legislative Jurisdiction, State Policies and Post-Occurrence Contacts in* Allstate Insurance Co. v. Hague, 81 COLUM. L. REV. 1134, 1134 (1981) (explaining that "[l]egislative jurisdiction is the power of a state to apply its law to a given set of facts, thereby affecting

legal interests"). A state generally possesses legislative jurisdiction over all lands within its borders. *See Surplus Trading Co. v. Cook*, 281 U.S. 647, 650 (1930). Under certain circumstances, however, the federal government may "acquire" legislative jurisdiction from a state. *Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976).

There are three main ways in which the federal government can do so. First, under the express terms of the U.S. Constitution's Enclave Clause, Congress can purchase land with the consent of the state legislature. *See* U.S. CONST. art. I, § 8, cl. 17 (according Congress with the power "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings"). Second, Congress may obtain jurisdiction by reserving it upon a state's admission into the Union. *See, e.g.*, *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 526–27 (1885). Third, the federal government may obtain jurisdiction over property through a state's cession of legislative jurisdiction, coupled with acceptance of the cession by the United States. *See Kleppe*, 426 U.S. at 542 (providing that "Congress may acquire derivative legislative power from a State . . . by nonconsensual acquisition followed by the State's subsequent cession of legislative authority over the land"); *accord United States v. Burton*, 888 F.2d

682, 684–85 (10th Cir. 1989) (observing that "[t]he federal government can obtain . . . legislative jurisdiction over specific property" by, *inter alia*, "receiving a cession of legislative jurisdiction from the state in which the property is located" (footnote omitted)).

The third method is at issue in this case. Specifically, the question here is whether Wyoming ceded to NPS legislative jurisdiction over private inholdings in Grand Teton National Park. We lay the groundwork for this analysis by first detailing the historical underpinnings of this issue.

**B**

Modern-day Grand Teton National Park came into existence in 1950—the culmination of a historic compromise between various competing interests following a decades-long, contentious struggle over the Park's creation. Because this fraught history underpins several key issues before us on appeal, we recount immediately *infra* the salient facts underlying the Park's controversial genesis and evolution, and the resulting compromise that was reached and ultimately embodied in the Park's enabling-act legislation. We then recount the facts that immediately gave rise to this appeal.

**1**

Though the modern-day version of the Park has its origins in 1950, the actual genesis of the Park dates back decades earlier, to 1929. It was in that year

10

that Congress first passed legislation establishing the Park, *see* Act of Feb. 26, 1929, Pub. L. No. 70-817, 45 Stat. 1314–16 (1929).  The original Park encompassed a comparatively modest 96,000 acres, consisting of only the Grand Teton mountain range and six glacial lakes at the base of the mountains—an area over three times smaller than the size of the Park as it now stands.  *See id*.

In the wake of the Park's creation in 1929, efforts to expand it started to gain traction, with the aim of more fully safeguarding the entire ecosystem encompassing the Park.  These efforts centered around a proposal by John D. Rockefeller to donate to the federal government about 33,000 acres of private land adjoining the original Park, on the condition that those lands would be preserved and added to the Park.  After Congress refused to expand the original Park so as to include the offered lands, President Franklin D. Roosevelt himself set this process in motion by unilaterally designating those lands the Jackson Hole National Monument.  *See* Proclamation No. 2578, 57 Stat. 731, 8 Fed. Reg. 3277 (Mar. 18, 1943).  The newly designated monument comprised a large tract of land adjacent to the original Park that included, *inter alia*, the 33,000 acres of Rockefeller-donated land, and which enclosed some 17,000 acres of private land. *See generally* Justin James Quigley*, Grand Staircase-Escalante National Monument: Preservation or Politics?*, 19 J. LAND RESOURCES & ENVTL. L. 55, 81

(1999); *see also* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 GA. L. REV. 473, 495–96 (2003).

The designation of the Jackson Hole National Monument stoked local backlash from the State of Wyoming and its residents. In particular, they were concerned about the effect that this new designation would have on Wyoming's ownership and management of the native elk herd; about the prospect of a potentially diminished local tax base and the resulting loss of local revenue stemming from the designation; and about the designation's impact on existing grazing and leasing rights. *See* J.A., Vol. VI, at 1069 (Mem. Addressing Meeting to Discuss Jackson Hole National Monument Problems, dated Apr. 21, 1949); *see* Laura Pousson, *The Battle Has Just Begun: Monumental Issues of Implied Powers Within the Antiquities Act of 1906*, 7 LSU J. ENERGY L. & RESOURCES 193, 195 (2019); *see also Wyoming v. Franke*, 58 F. Supp. 890, 896 (D. Wyo. 1945). As such, in 1949, a group of Wyoming officials met with representatives from the federal government to discuss the aforementioned "Jackson Hole National Monument problems" and to devise workable solutions to these issues. J.A., Vol. VI, at 1068.

As contemporaneous records from this meeting reveal, the issue of the elk herd's ownership and management on Monument lands turned out to be a particularly thorny topic. *See id.* at 1072 (noting that although "[t]here was no

12

trouble in getting to an agreement on the questions of taxation, grazing," and leasing matters, "[t]he big trouble came with the elk herd—as might be expected"); *see also id.* at 1061 (Letter from L. Miller to Governor, dated Apr. 6, 1949) ("If it were not for the elk herd, I would be willing to forget the whole damn business. However, I don't feel we can let the sportsmen down and turn the elk herd over to the Federal Government.").

Specifically, the Wyoming Game and Fish Commission ("WGFD") sought to maintain exclusive control over hunting on the Monument lands "so that the elk herd could be properly managed by the Commission." *Id.* at 1059 (Letter from F. Barrett to H. Miner, dated Apr. 1, 1949). NPS's policy, however, was to generally prohibit hunting on such lands. *Id.* at 1061 (explaining that although "some people feel . . . that this monument could stand and Wyoming still maintain control of the hunting on this area, . . . knowing the [National] Park Service as I do, I am sure that just isn't possible"); *id.* at 1089 (Letter to A.G. Crane, Governor of Wyoming, dated Apr. 25, 1949) ("When it came to the management and control of the Jackson Hole Elk Herd we found our differences not so easily resolved. The line was quite clear cut between park policy and state control.").

To resolve the controversy with Wyoming and facilitate Park expansion, the federal government made various concessions to Wyoming in negotiating the expansion of Grand Teton National Park. Congress ultimately embodied those

13

concessions in the Grand Teton Enabling Act—legislation enacted in 1950 that established the modern-day Park. *See* Act of Sept. 14, 1950, Pub. L. No. 81-787, 64 Stat. 849 (1950) (codified at 16 U.S.C. §§ 406d-1 to 406d-5, 673c). Three sections of this statute are of particular note.

First, Section 6 of the Grand Teton Enabling Act addresses the most contentious of the issues confronting the parties: elk management in the Park. Under this section, Congress established a program—the Elk Reduction Program—to "insure the permanent conservation of the elk within [the Park]." 16 U.S.C. § 673c(a). The Elk Reduction Program contemplates "the controlled reduction of elk in [the Park], by hunters licensed by the State of Wyoming and deputized as rangers by the Secretary of the Interior, when it is found necessary for the purpose of proper management and protection of the elk." *Id.*

The responsibility of administering this program is delegated to WGFD and NPS: each year, the two agencies must jointly submit, to the U.S. Secretary of the Interior and the Governor of Wyoming for approval by both, a plan "for the management, protection, and control of the elk for that year." *Id.* § 673c(b). That annual plan must provide for "the controlled reduction of elk . . . when it is found necessary for the purpose of proper management and protection of the elk." *Id.* § 673c(a). Upon the Secretary of the Interior's and the Governor of Wyoming's approval of the annual plan, that plan "shall become effective." *Id.* § 673c(b).

14

Furthermore, Section 5 of the Enabling Act was enacted with an aim to address Wyoming's expressed concerns over taxation. Specifically, this section established a schedule by which the United States was to compensate Wyoming for lost tax revenue resulting from the federal government's acquisition of private lands that were included in the expanded national park. *Id.* § 406d-3; *see also* H.R. Rep. No. 81-2910 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3746, 3747–49. Then, in 1953, Wyoming adopted legislation to implement Section 5. This implementing legislation provided for the distribution of the funds received under Section 5 to the appropriate tax districts in Teton County, where the lands in question were located. *See* WYO. STAT. §§ 36-10-201 to -203.

Finally, Section 4 of the Enabling Act was enacted to address concerns about leasing and grazing rights. That provision directs NPS to provide rights-of-way over federal lands to allow access to inholdings, and to continue the federal grazing leases appurtenant to private inholdings until certain conditions occur. 16 U.S.C. § 406d-2. Notwithstanding this section, the Enabling Act otherwise does not expressly address activities on inholdings.

**2**

It is against this historical backdrop that the administrative actions giving rise to this appeal transpired. The first challenged administrative action has its roots in a 2011 proposal by the U.S. Fish and Wildlife Service to remove

15

Wyoming's gray wolf population from the list of threatened and endangered species maintained under the Endangered Species Act.  This proposed delisting triggered a series of communications between Wyoming and the federal government concerning the management of the gray wolf.

As relevant here, these communications ultimately focused on the extent (if any) of NPS's jurisdiction to manage gray wolves on the Park's private and state inholdings.  *See, e.g.*, NPS's Suppl. App. at 76 (Email from B. Nesvik, WGFD, to T. Whittington, NPS, dated Jan. 8, 2013) (requesting a meeting between WGFD and NPS in order "to discuss a way forward regarding jurisdictional concerns existing on private inholdings in [the Park]"); J.A., Vol. III, at 668 (Letter from B. Nesvik, WGFD, to T. Whittington, NPS, dated Mar. 12, 2013) (memorializing February 2013 meeting between WGFD and NPS "regarding jurisdictional issues and details of Wyoming's laws related to wolf management").

In this regard, during a February 2013 meeting between WGFD and NPS officials, the two agencies set out their respective positions on this issue. According to WGFD, in light of the delisting decision, Wyoming law—which, unlike federal law, permitted private property owners to take gray wolves caught damaging their property—applied to the Park's inholdings.  *See* WYO. STAT. § 23-3-115 (providing that state statutory provision authorizing "the owner of [private] property" to "immediately take[] and kill[]" certain animals "doing

16

damage to private property" "shall apply to gray wolves from and after the date gray wolves are removed from the list of . . . endangered species or threatened species in Wyoming").

NPS, for its part, reiterated its long-held position that the federal government had jurisdiction over the inholdings, and therefore, 36 C.F.R. § 2.2—which for the most part prohibits the taking of wildlife on Park lands—prevailed over any conflicting Wyoming laws. As a result, under NPS's view, in the hypothetical scenario in which a private landowner were to take a gray wolf "doing damage to private property," § 2.2's prohibition of such activity—not Wyoming law's authorization of it—would control, thus exposing the landowner to potential federal prosecution. J.A., Vol. III, at 669.

In March 2013, WGFD sent a letter to NPS expressing its "concern" with NPS's interpretation of § 2.2 and "[t]he lack of consensus" between the two agencies regarding wildlife management on Park inholdings. *Id.* at 668–70. Specifically, WGFD pointed out that under Wyoming law, a private landowner, by and large, would be allowed to take a wolf that was inflicting damage on that landowner's property. If § 2.2 were to be applied to that hypothetical landowner's property instead, however, that same landowner could face prosecution. Accordingly, WGFD recommended that NPS obtain a written commitment from the United States Attorney for the District of Wyoming not to

17

prosecute a private landowner "who would otherwise have legal authority to take wildlife under [Wyoming law], but may be prohibited from doing so because [his or her] fee title lands lie within the external boundary of [Grand Teton]." *Id.* at 670.

In response to WGFD's letter, NPS conducted a months-long examination into the question of whether it did "in fact have the legal jurisdiction of management [of] (wolves) on private in holdings within the boundary of [the Park]." *Id.* at 671 (Email from M. Wrigley, NPS, to P. Malone, NPS, dated Mar. 27, 2013).[3] NPS and WGFD agreed to meet again on February 5, 2014, where NPS was slated to provide a response to WGFD's letter. *Id.*, Vol. IV, at 729–30 (Email from P. Malone, NPS, to B. Nesvik, WGFD, et al., dated Jan. 28, 2014).

Shortly before that meeting, on January 20, 2014, the owner of a private inholding in the Park shot and killed a gray wolf on his property that was attempting to attack the landowner's livestock—bringing to the fore the once-hypothetical question of NPS's jurisdiction over the management of gray wolves on inholdings. Whether NPS had jurisdiction over the inholdings—thereby rendering 36 C.F.R. § 2.2 applicable to these lands—had potentially significant

---

[3] *See also, e.g., id.* at 672 (Calendar Invitation from T. Whittington, NPS, to P. Malone, NPS, et al., re "GRTE Inholdings/Wolves," dated May 13, 2013); *id.* at 673 (Email from T. Whittington, NPS, to B. Nesvik, WGFD, et al., dated May 17, 2013); *id.* at 676 (Email from R. Kahn, NPS, to T. Whittington, NPS, dated Aug. 15, 2013).

18

implications. If § 2.2 were to be deemed applicable, then the landowner had violated federal law and was subject to criminal prosecution. If, on the other hand, Wyoming law were deemed to be applicable, then the landowner had not violated the law and faced no such risk of prosecution.

Upon completing an investigation of the incident, the United States Attorney for the District of Wyoming declined to prosecute the landowner, finding, *inter alia*, that NPS "was in error in interpreting 36 CFR [§] 2.2 as being applicable on the inholding." J.A., Vol. V, at 838 (Briefing Statement—Grand Teton National Park, dated Dec. 22, 2014). Also, at around this point in time, the Department of Interior's Office of the Solicitor, which had been independently researching the issue, arrived at the same conclusion—that is, "that the NPS could not enforce the regulation [i.e., 36 C.F.R. § 2.2] on privately owned lands within the [P]ark. Therefore, the Wyoming statute that allows for the killing of wolves when found in the act of depredating wildlife did not conflict [with federal law]." *Id.* Both the United States Attorney's Office and the Department of Interior thereafter advised NPS of their legal conclusion. *Id.* at 844 (Paper re: "Enforcing Federal Regulations on private inholdings in Grand Teton National Park," dated Jan. 30, 2015, as revised).

19

Based on this advice, on November 11, 2014, NPS sent a letter to WGFD, advising WGFD that it had concluded that § 2.2 does not apply to the Park's private inholdings:

> For many years we assumed that 36 CFR [§] 2.2 applied on private inholdings within Grand Teton and prohibited the taking of wildlife on those inholdings. While NPS continues its interest in ensuring that wildlife management on private inholdings does not negatively impact park resources, we have concluded that 36 CFR [§] 2.2 does not apply to private inholdings within Grand Teton.

*Id.*, Vol. IV, at 834 (Excerpt of Letter from NPS to B. Nesvik, WGFD, dated Nov. 11, 2014) [hereinafter periodically referred to as the "November 2014 decision"].[4]

---

[4]   In its November 2014 decision, NPS concluded that § 2.2 does not apply to the Park's *private* inholdings; it did not expressly opine on § 2.2's applicability to *state-owned* inholdings. We recognize that the joint appendix includes one postdecisional email indicating that some NPS employees believed that NPS's decision was in fact applicable to such state-owned inholdings. *See* J.A., Vol. V, at 840 (Email from K. Albright, NPS, to M. Nash, NPS, et al., dated Jan. 2, 2015) (explaining that "until further direction is provided, we will not enforce CFR violations on lands within Grand Teton National Park that are not owned by the Federal Government (think . . . private property, *state school land*)" (omission in original) (emphasis added) (bolded font omitted)). Having said that, there is nothing to suggest that agency decisionmakers squarely addressed the question of § 2.2's applicability to state-owned inholdings; in any event, the aforementioned email was not a part of the administrative record. As such, insofar as there are any meaningful distinctions between private- and state-owned inholdings as they pertain to the issues before us, any pronouncements that we make thereto are confined to private inholdings. *See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) ("Judicial review of agency action is normally restricted to the administrative record.").

In a subsequent internal briefing paper, NPS explained that its decision was based on the text of § 2.2, the preamble in the Federal Register, and the text of Wyoming's 1977 cession statute, *see* WYO. STAT. § 5-1-108 (ceding "[c]oncurrent jurisdiction over crimes and offenses under the laws of the state of Wyoming . . . to the United States over and within all the territory dedicated to national park, monument, historic site or public recreational purposes").

**2**

The second challenged agency action unfolded in May 2015 and concerns the Elk Reduction Program. As detailed *supra*, this program provides for "the controlled reduction of elk in [the Park], by hunters licensed by the State of Wyoming and deputized as rangers by the Secretary of the Interior, when it is found necessary for the purpose of proper management and protection of the elk." 16 U.S.C. § 673c(a).

By way of brief background, in the nearly ten years preceding 2015, there were two Park areas in which elk could be hunted under the Elk Reduction Program: Hunt Area 75 and Hunt Area 79. During that pre-2015 period, those two hunt areas encompassed both state-owned and privately owned land, *viz.*, inholdings. One such inholding was Pinto Ranch, a 450-acre private inholding that fell in part within the Park's boundaries, and which part, up until 2015, had been included within Hunt Area 79. In other words, before 2015, both NPS and

21

WGFD operated with the understanding that the Elk Reduction Program's requirements were applicable to all elk hunters in Hunt Areas 75 and 79 of the Park, whether they were on federally owned land on the one hand, or on an inholding—such as Pinto Ranch—on the other. No other elk hunting was permitted anywhere within the Park's boundaries.

This longstanding scheme changed in 2015, several months after NPS's November 2014 decision that 36 C.F.R. § 2.2 did not apply to private inholdings. In April 2015, field representatives at NPS and WGFD issued a joint memorandum to the two agencies, recommending that an elk hunt under the Elk Reduction Program be carried out in the fall of that year. *See* J.A., Vol. V, at 847–50 (Joint Field Recommendation Concerning Elk Management Within the Park for the Year 2015); *see also* 16 U.S.C. § 673c. The memorandum specified that the elk hunt should occur, consistent with prior years, in Hunt Areas 75 and 79.

After receiving the joint recommendation, WGFD amended the elk hunt boundary by removing the portion of Pinto Ranch within the Park from Hunt Area 79 and adding it to Hunt Area 70. *See, e.g.*, 040-7 WYO. CODE R. § 8 (2014) (description of Hunt Area 70 as of 2014); *see also* J.A., Vol. V, at 884–85 (Draft chart prepared by Wyoming Game and Fish Commission regarding 2015 elk hunting seasons, reflecting addition of Pinto Ranch to Hunt Area 70). Pursuant to

22

state regulation, elk hunting in Hunt Area 70—unlike in Hunt Areas 75 and 79—was not subject to the Elk Reduction Program. *See, e.g.*, 040-7 WYO. CODE R. § 7(g) (2015) (embodying regulations governing elk hunting in the Park, and providing that "[Hunt] Area 75 and 79"—and Hunt Areas 75 and 79 only—"shall be closed to elk hunting in Grand Teton National Park"). Thus, in moving Pinto Ranch from Hunt Area 79 to Hunt Area 70, WGFD effectively removed Pinto Ranch from the Elk Reduction Program, thereby subjecting that inholding (as relevant to this case) exclusively to state hunting regulations.

Shortly thereafter, NPS signed off on the joint recommendation memorandum for the 2015 Elk Reduction Program, which incorporated WGFD's above-noted boundary amendments. Thus, NPS approved of WGFD's removing Pinto Ranch from Hunt Area 79 and adding it to Hunt Area 70. *See* J.A., Vol. V, at 886–88 (Joint Recommendation for the Management of Elk within the Park for the Year 2015, dated in relevant part April 2015) (adopting the new boundary of Hunt Areas 79 from WGFD's revised regulations, in which Hunt Area 79 ends at the Pinto Ranch rather than including it). Subsequently, in May 2015, NPS's regional director (acting on behalf of the U.S. Secretary of the Interior) and the Governor of Wyoming jointly approved the 2015 Elk Reduction Program for the Park—thereby putting into effect the boundary amendments to Hunt Area 70 and 79. *See* 16 U.S.C. § 673c(b) (explaining that "[t]he yearly plan recommended by

the Wyoming Game and Fish Commission and the National Park Service shall become effective when approved by the Secretary of the Interior and the Governor of Wyoming"). As a result of these boundary amendments, NPS ceased to exercise control over elk hunting on the Pinto Ranch as part of the Elk Reduction Program.

The hunting season under the 2015 Elk Reduction Program ended on December 13, 2015. In subsequent years material to this lawsuit, the boundaries of Hunt Areas 70 and 79 remained unchanged from those NPS approved for purposes of the 2015 Elk Reduction Program. That is to say, Pinto Ranch remained a part of Hunt Area 70 and, therefore, continued to fall outside of the Elk Reduction Program's ambit during all times material here. *See, e.g.*, 040-7 WYO. CODE R. § 8 (2016) (indicating that Pinto Ranch is encompassed by Hunt Area 70, *viz.*, not Hunt Area 79); *id.* § 8 (2017) (same); *id.* § 8 (2018) (same).

## C

Having laid out the salient legal, historical, and factual background, we now briefly recount the procedural history underlying this appeal.

## 1

On March 23, 2016, the Conservation Association filed a complaint in the United States District Court for the District of Columbia contesting, in essence, "NPS's abdication of jurisdiction." J.A., Vol. I, at 29–32 (Conservation Ass'n

24

Compl., filed Mar. 23, 2016); *see also generally id.* at 17–46. Specifically, the

Conservation Association asserted challenges to two actions taken by NPS in

which NPS allegedly "abdicat[ed] [its] jurisdiction": (1) its November 2014

decision that 36 C.F.R. § 2.2 does not apply to the Park's private inholdings, and

(2) its approval of WGFD's revisions to the 2015 Elk Reduction Program's

boundaries, which effectively removed the Pinto Ranch inholding from the

program. *See id.* at 17–46. That same day, a second group of plaintiffs led by

Defenders filed suit in the District of Columbia, likewise challenging NPS's

November 2014 decision regarding the applicability of § 2.2 to the Park's

inholdings.[5] *See id.* at 47–72 (Defenders' Compl. for Declaratory & Injunctive

Relief, filed Mar. 23, 2016).

In particular, with respect to the first challenged action, both complaints

alleged that during negotiations between Wyoming and the federal government

leading up to the passage of the Enabling Act in 1950, Wyoming officials

"implicitly ceded" to the United States jurisdiction to manage hunting and

wildlife on all lands in the Park, including on inholdings. *Id.* at 26–27, 40; *id.* at

67–68. They alleged that this cession arose from an "agreement" reached

between the parties during the 1949–50 negotiations, as evidenced by

---

[5]     Defenders does not, however, challenge NPS's approval of the
boundary revisions to the 2015 Elk Reduction Program; only the Conservation
Association raises that challenge.

25

contemporaneous records from those negotiations obtained from the National Archives and Records Administration (the "1949–50 records").

In support of this theory, they asserted that two Eighth Circuit decisions, *United States v. Brown*, 552 F.2d 817 (8th Cir. 1977), and *United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999), established that state officials may cede legislative jurisdiction without the authorization or approval of the state's legislature. And, they contended that because NPS had failed to consider the cession agreement that was purportedly evidenced by the 1949–50 records, its decision that § 2.2 does not apply to the Park's private inholdings was arbitrary and capricious and contrary to law. With respect to the second challenged action, the Conservation Association contended that NPS acted arbitrarily and capriciously by failing to explain its reasons for approving the boundary revisions to the 2015 Elk Reduction Program. It attacked NPS's legal authority to make that decision.

**2**

After the Conservation Association and Defenders filed their respective complaints, the two cases were consolidated for administrative purposes. The case was subsequently transferred to the District of Wyoming, whereupon Wyoming intervened as a defendant.

After the administrative record was filed in this case, the Conservation

Association and Defenders each moved to supplement the administrative record with, *inter alia*, documents "reflecting the negotiations and compromises embodied in the legislation that gave birth to Grand Teton National Park," *viz.*, the 1949–50 records. NPS's Suppl. App. at 13 (Defenders' Mem. in Supp. of Pls.' Mot. to Suppl. Administrative R., filed June 23, 2017); *see also id.* at 3–4 (Conservation Ass'n's Mem. in Supp. of Mot. to Suppl. Administrative R., filed June 23, 2017). In their view, these documents were "central to the ultimate legal question in this case of whether the federal defendants considered all relevant factors regarding the allocation of state and federal jurisdiction over hunting of wildlife within [the Park's] boundaries." *Id.* at 13. NPS disagreed, rejoining that it "had no reason or obligation" to consider the 1949–50 records, seeing as the existence of a cession of legislative jurisdiction turns on (1) whether the state legislature has ceded such jurisdiction to the federal government (and, if so, to what extent); and (2) whether the United States has accepted the cession pursuant to the Act of 1940—factors on which, reasoned NPS, the 1949–50 records had no bearing. J.A., Vol. I, at 81–89 (NPS's Resp. in Opp. to Pls.' Administrative R. Mots., filed July 28, 2017).

The district court granted the motions in relevant part, authorizing the addition of the 1949–50 records to the administrative record. At the same time, the court deferred ruling on the relevance of these documents until the merits

27

stage.

**3**

The parties then proceeded to merits briefing regarding the two NPS actions in dispute. On July 12, 2018, the district court issued an order in which it upheld both of those actions, holding that neither of them was contrary to law or arbitrary and capricious under the APA.

The district court held, as a threshold matter, that the Conservation Association and Defenders had Article III standing to challenge both of the actions. Proceeding to the merits, the court first addressed, and ultimately upheld, NPS's decision that 36 C.F.R. § 2.2 does not apply to the Park's inholdings. In this regard, the court rejected the Conservation Association and Defenders' argument that, based on the 1949–50 records, Wyoming officials had implicitly ceded to the federal government jurisdiction to manage wildlife on all Park lands during the 1949–50 negotiations. The court explained that, in order for a state to cede jurisdiction to the federal government, "legislative action is required." *Id.*, Vol. III, at 576–77 (Dist. Ct. Order Upholding Agency Action, filed July 12, 2018). As such, because the Wyoming Legislature never approved or authorized a cession relating to the 1949–50 negotiations, "no cession occurred," the court concluded. *Id.* at 578. The court also held that, even if legislative action were not required for a state to cede its jurisdiction, there must have been affirmative

28

acceptance of jurisdiction by the federal government, and there was no such federal acceptance in connection with the 1949–50 negotiations. Finally, the court rejected Defenders' argument that the Property Clause of the U.S. Constitution provides an independent basis for finding § 2.2 applicable on Park inholdings.

Turning to the second agency action in dispute—that is, NPS's approval of WGFD's revisions to the 2015 Elk Reduction Program's boundaries—the district court affirmed that action as well. The court rejected the Conservation Association's argument that NPS—by approving the boundary revisions such that it "no longer had any say in how many elk could be shot on the Pinto Ranch inholding"—violated Section 6 of the Enabling Act governing the Elk Reduction Program, 16 U.S.C. § 673c(b). *Id.* at 590 (quoting J.A., Vol. I, at 244 (Pls.' Opening Br. on the Merits, filed Jan. 26, 2018)). The court noted that nothing in the Enabling Act requires NPS to have a say in "how many elk can be hunted on a private inholding." *Id.* And the court reasoned that, in any event, the federal government cannot force Pinto Ranch to participate in the Elk Reduction Program because (as the district court had just determined, *supra*) Wyoming never ceded jurisdiction to the federal government over the Park's inholdings. Therefore, the court held, NPS's decision to approve the boundary change "needs no further explanation" and was, "at most, harmless error." *Id.* at 591.

29

The district court entered judgment in favor of NPS and Wyoming on July 13, 2018.

**II**

The Appellants now appeal from that judgment. Their appeal raises two overarching questions: First, was NPS's November 2014 decision that 36 C.F.R. § 2.2 does not apply to the Park's private inholdings arbitrary and capricious or contrary to law? And second, was NPS's approval of WGFD's boundary amendments under the 2015 Elk Reduction Program arbitrary and capricious or contrary to law?

In answering those questions, we proceed de novo, applying the same standard of review as that applied by the district court. *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904 (D.C. Cir. 2010); *see also WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017). Accordingly, we review NPS's challenged actions under the APA's familiar arbitrary-and-capricious standard,[6] which provides that an agency action is to be set aside only

---

[6] In order to be judicially reviewable under the APA, the challenged agency action must be "final." 5 U.S.C. § 704 (delineating the types of actions that are "subject to judicial review" under the APA, including, in relevant part, "*final* agency action" (emphasis added)); *see, e.g.*, *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) (providing that plaintiffs seeking judicial review under the APA were required to "establish that defendants took 'final agency action'" (quoting 5 U.S.C. § 704)). The parties in this action do not voice any disagreement about the portion of the district court's order

(continued...)

if, as relevant here, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[7] That test is met where "the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *WildEarth Guardians*, 870 F.3d at 1233 (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)).

In conducting this analysis, our inquiry "must be thorough, but the standard of review is very deferential to the agency." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (quoting *Hillsdale Envtl. Loss*

[6](...continued)
ruling that the two NPS actions in dispute constitute "final agency action." J.A., Vol. III, at 559–62. As such, we treat as undisputed the issue of whether both of these actions are "final," without undertaking further analysis of the matter. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1031 (9th Cir. 2020) (observing that "[t]he parties d[id] not dispute that the [actions] at issue [we]re final agency actions subject to review pursuant to the APA," and engaging in no inquiry into the matter beyond that); *Mallinckrodt ARD LLC v. Verma*, 444 F. Supp. 3d 150, 168 (D.D.C. 2020) (similar).

[7]    We employ the phrase, "arbitrary-and-capricious standard" as a catchall term for § 706(2)(A) of the APA. *See Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 39, 47 (D.D.C. 2012) (characterizing the entirety of § 706(2)(A) as "the 'arbitrary and capricious [standard]'"), *aff'd sub nom. Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079 (D.C. Cir. 2015).

*Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012)). Throughout the course of our review, we may not "substitute [our] judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), and, in fact, we must "presume that an agency action is valid unless the party challenging the action proves otherwise." *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020); *see Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014) (explaining that the arbitrary-and-capricious "standard of review is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it" (quoting *W. Watersheds Project*, 721 F.3d at 1273)). At bottom, "[t]his is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### III

With the standard of review laid out, we can turn to the first of the two agency actions under review: that is, NPS's November 2014 decision that 36 C.F.R. § 2.2 does not apply to the Park's inholdings. In the Appellants' briefs,

32

there are two main challenges to this action. First, both Defenders and the Conservation Association argue that the agency's decision was arbitrary and capricious, based on the agency's determination that it lacked legislative jurisdiction over Park inholdings. Second, Defenders argues that, in rendering its November 2014 decision, NPS arbitrarily ignored its independent authority under the U.S. Constitution's Property Clause to protect wildlife on Park inholdings.[8] We address the first ground that the Appellants assert in Part A and the second ground that Defenders asserts in Part B; neither ground is persuasive. We thus affirm the district court's judgment upholding NPS's November 2014 decision.

## A

We first review NPS's decision that § 2.2 is inapplicable to Park inholdings because those areas are not "under the legislative jurisdiction of the United States." *See* 36 C.F.R. § 2.2(g) (providing that "[t]he regulations contained in this section apply, regardless of land ownership, on all lands and waters within a park area that are *under the legislative jurisdiction of the United States*" (emphasis added)). At bottom, the Appellants contend that Wyoming ceded jurisdiction over the Park's inholdings to the federal government during the 1949–50 negotiations that resulted in the creation of the modern-day Park.

---

[8] This argument is advanced only by Defenders. The Conservation Association did not raise this argument in its briefing in the district court, nor does it do so on appeal.

According to the Appellants, NPS acted arbitrarily by failing to consider this act of state cession—and, in particular, the 1949–50 records that (the Appellants say) evince this cession—and, consequently, NPS's decision should be set aside on this basis.

NPS and Wyoming reject the Appellants' position. They argue instead that Wyoming never ceded legislative jurisdiction to the federal government during the 1949–50 negotiations. This is because, according to NPS and Wyoming, there is only one way that a state may cede legislative jurisdiction—and that is through the state legislature's enactment of legislation ceding its authority to the federal government. Here, no such legislation exists, and thus no valid cession occurred, they conclude.

We agree with NPS and Wyoming. More specifically, we hold that the only way in which a state may cede its jurisdiction is by act of the state's legislature, and there is no statutory or record evidence before us showing that the Wyoming Legislature authorized or approved any cession in connection with the 1949–50 negotiations. Thus, Wyoming never ceded its legislative jurisdiction to the federal government, and we therefore affirm the district court's judgment upholding NPS's November 2014 decision. We elaborate below.

**1**

In challenging NPS's determination that it lacks legislative jurisdiction

over Park inholdings—and, as a result, that § 2.2 is inapplicable on these inholdings—the Appellants principally argue that Wyoming ceded legislative jurisdiction over all Park lands, including the Park's inholdings, to NPS. Specifically, they contend that during the 1949–50 negotiations, Wyoming reached a "compromise agreement" with the federal government, pursuant to which no hunting would be allowed anywhere within the Park's exterior boundaries other than under the Elk Reduction Program, regardless of what state law otherwise dictated. That agreement, the Appellants urge us to find, was "tantamount" to a cession of jurisdiction. Defenders' Opening Br. at 32 (quoting *Brown*, 552 F.2d at 821); *see also, e.g.*, *id.* at 29–30.

We begin with the observation that the Appellants' argument is predicated on a key assumption: that a state can in fact cede legislative jurisdiction to the federal government via an "agreement." *See, e.g.*, Conservation Ass'n's Opening Br. at 23 n.11, 40–41. The district court roundly rejected that assumption, and NPS and Wyoming urge us to do the same on appeal: according to them, there is only one way in which a state may cede its jurisdiction, and that is through state legislation; an "agreement," they argue, simply cannot effectuate a valid cession. Thus, before engaging any further with the substance of the Appellants' argument, we first examine whether a state can in fact cede its jurisdiction via an "agreement," as the Appellants press, or whether state legislative action is, as

35

NPS and Wyoming argue, necessary for such a cession.

We hold that action by a state legislature—and by a state legislature only—is required for a cession of jurisdiction, and that the Appellants' belief otherwise is fundamentally misguided. Our holding is grounded in time-honored principles of American government, as well as the significant weight of caselaw uniformly finding a cession of jurisdiction only where there had been corresponding state legislative action.

**a**

The principles underlying our very system of government establish that a cession of jurisdiction must come from the state legislature. From time immemorial, a cardinal principle of American government has been the separation of powers. *See generally, e.g.*, THE FEDERALIST NO. 47 (James Madison). This principle, embedded in our founding federal and state constitutions alike, calls for the placement of legislative, executive, and judicial power in three different institutions of government. *Id.*; *see* WYO. CONST. art. II, § 1 (providing that "[t]he powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial"); *cf.* Edward B. Foley, *The Separation of Electoral Powers*, 74 MONT. L. REV. 139, 139 (2013). Under this system, as most relevant here, "legislative power is always, initially, vested in a representative legislature." John Ferejohn, *Judicializing Politics, Politicizing*

36

*Law*, 65 LAW & CONTEMP. PROBS. 41, 44 (2002); *see* WYO. CONST. art. III, § 1

("The legislative power shall be vested in a senate and house of representatives,

which shall be designated 'the legislature of the State of Wyoming.'"); *see also*

Foley, *supra*, at 142 ("[T]here is no more basic tenet in republican political theory

than that legislative power resides with the legislature.").

By vesting these three distinct sets of powers in the three separate branches

of government, those powers belong exclusively to the respective branches in

which they are vested. *See* WYO. CONST. art. II, § 1 (mandating that "no person

or collection of persons charged with the exercise of powers properly belonging

to one of these departments shall exercise any powers properly belonging to either

of the others, except as in this constitution expressly directed or permitted"); *cf.*

*INS v. Chadha*, 462 U.S. 919, 945–46 (1983). Importantly, this then means that

those powers can be given away *only* by the branch in which those powers are

vested; after all, powers cannot be given away by those that do not possess them

in the first place. *See* James T. Blanch, *The Constitutionality of the False Claims*

*Act's Qui Tam Provision*, 16 HARV. J.L. & PUB. POL'Y 701, 718 (1993) ("In

constitutional law[,] . . . one cannot give away what one does not possess.").

From these foundational tenets of government flow an inexorable

conclusion: legislative power, which is vested exclusively in the legislative

branch, can be given away—that is, ceded—*only* by the legislature itself. *See*

37

*Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne*, 371 P.2d 409, 418 (Wyo. 1962) (noting that "the power to legislate . . . . is vested exclusively in the legislature by constitutional edict").  Put another way, a state can cede its legislative jurisdiction *only* through an act of the state legislature providing for such a cession.  To find otherwise would fly in the face of the inviolable separation-of-powers principle.

The U.S. Supreme Court's pronouncements underscore this principle.  As the Court has expressly recognized, it is the *state legislature* that may cede legislative jurisdiction to the federal government.  *See, e.g., Home Telephone & Telegraph Co. v. City of Los Angeles*, 211 U.S. 265, 273 (1908) (declaring that "[n]o other body than the supreme legislature (in this case, the legislature of the state) has the authority to make . . . a surrender [of its powers], unless the authority is clearly delegated to it by the supreme legislature"); *Chi., Rock Island & Pac. Ry. Co. v. McGlinn*, 114 U.S. 542, 546 (1885) (holding that "it is competent for the *legislature of a state* to cede exclusive jurisdiction over places needed by the general government in the execution of its powers" (emphasis added)); *Fort Leavenworth R.R. Co.*, 114 U.S. at 541–42 (endorsing the notion of "a [state's] cession of legislative authority and political jurisdiction . . . *by the legislature of the state*" (emphasis added)); *see also Bowen v. Johnston*, 306 U.S. 19, 23 (1939) (explaining that whether the federal government acquired

jurisdiction over the lands in a national park "depended upon the terms of the consent or cession given by the *legislature of Georgia*" (emphasis added)).

The caselaw of this court and of other courts around the country is consistent with these pronouncements. Specifically, in the legion of cases involving a state's cession of jurisdiction, there is one notable, common thread: the cession was effectuated via an act of the *state legislature. See, e.g.*, *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 527–28 (1938) (jurisdiction ceded via "Acts of cession" of California Legislature); *United States v. Fields*, 516 F.3d 923, 929–30 (10th Cir. 2008) (jurisdiction ceded via the "[Oklahoma] Cession Act"); *Hayes v. United States*, 367 F.2d 216, 219 (10th Cir. 1966) (jurisdiction ceded via "an act of the [Kansas] Legislature in 1875"); *United States v. Lovely*, 319 F.2d 673, 680 (4th Cir. 1963) (jurisdiction ceded via certain "statutes [enacted by] . . . the Legislature of South Carolina"); *Stokes v. Adair*, 265 F.2d 662, 664 (4th Cir. 1959) (jurisdiction ceded via "an act of the [Kansas] state legislature"); *Rogers v. Squier*, 157 F.2d 948, 949 (9th Cir. 1946) (jurisdiction ceded via "an act of the Utah legislature"); *Capetola v. Barclay White Co.*, 139 F.2d 556, 558 (3d Cir. 1943) (jurisdiction ceded via "appropriate Acts of the Pennsylvania legislature"); *Chalk v. United States*, 114 F.2d 207, 209–10 (4th Cir. 1940) (jurisdiction ceded via "the Act of the North Carolina Legislature of 1915"); *Yellowstone Park Transp. Co. v. Gallatin County*, 31 F.2d 644, 645 (9th

39

Cir. 1929) (jurisdiction ceded via an "act of the Montana Legislature"). These cited cases are but the tip of the iceberg. Indeed, our independent research revealed not a single case involving a state's cession of jurisdiction absent state legislative action.

**b**

The cases that the Appellants principally rely on are not to the contrary. In particular, throughout their briefing they make much out of two Eighth Circuit cases, *United States v. Brown*, 552 F.2d 817 (8th Cir. 1977), and *United States v. Armstrong*, 186 F.3d 1055 (8th Cir. 1999). These cases, they claim, illustrate that a state can in fact cede its jurisdiction "absent an applicable [state] cession statute." Conservation Ass'n's Opening Br. at 32. We disagree. *Brown* and *Armstrong* are factually inapposite. Moreover, in actuality, they lend further support to our conclusion that state legislative action is necessary for a cession of jurisdiction.

By way of background, both *Brown* and *Armstrong* concerned the extent of Minnesota's cession of jurisdiction over Voyageurs National Park to the federal government. In *Brown*, the defendant was convicted of violating NPS regulations prohibiting possession of a loaded firearm and hunting of wildlife in national parks, after having been found duck hunting on waters inside the boundaries of the park. *See* 552 F.2d at 819. The defendant conceded that he was duck hunting

40

within the boundaries of the national park, but asserted that the state had never ceded jurisdiction over the *waters* in the park to the United States, thus rendering the NPS regulations at issue inapplicable to him. *Id.* In 1971, the Minnesota Legislature had enacted enabling legislation that, among other things, ceded jurisdiction to the federal government, providing as follows:

> Consent of the state of Minnesota is given to the acquisition by the United States in any manner authorized by act of Congress of *lands* lying within the boundaries of Voyageurs National Park for any purpose incident to the development and maintenance of the park, subject to concurrent jurisdiction of the state and the United States as defined in section 1.041.

MINN. STAT. § 84B.06 (emphasis added). Based on the language of this state statute—which only explicitly addresses "lands" within the park's boundaries—the Eighth Circuit noted that it was "not abundantly clear that the state of Minnesota ceded jurisdiction over the *waters* in the park to the United States," acknowledging that the statute "ostensibly consents to [legislative jurisdiction] only over the lands within the park." *Brown*, 552 F.2d at 820 (emphasis added).

Nevertheless, the court ultimately concluded that Minnesota had ceded jurisdiction over the waters inside the park to the federal government. The court reasoned that based on the plain language and legislative history of the federal enabling legislation that Congress enacted, Congress had "clearly demonstrated"

41

its intent to exercise "regulatory jurisdiction" over park waters and to prohibit waterfowl hunting anywhere in the park. *Id.* at 820–21. Then, when Minnesota subsequently enacted its own comprehensive enabling legislation, the court explained, the state explicitly endorsed Congress's objectives in creating the park—including the protection of its waters—and did so "with the knowledge that the federal government intended to [categorically] prohibit hunting within the boundaries of the park." *Id.* at 821. In light of those facts, the court held that "the state's active participation in the creation of Voyageurs Park with the knowledge that Congress intended that hunting would be prohibited throughout the park was tantamount to a cession of jurisdiction over the lands and the waters within the park boundaries." *Id.*

The Eighth Circuit's subsequent decision in *Armstrong* echoed this reasoning. The defendants there were convicted of operating a commercial boating business within the boundaries of Voyageurs National Park without a permit, in violation of NPS regulations. 186 F.3d at 1057–59. As in *Brown*, the court was again confronted with the argument that the federal government lacked jurisdiction to enforce NPS regulations on park waters. *Id.* at 1059–61.

In addressing this issue, the *Armstrong* court, like the *Brown* court, focused on Congress's intent in establishing the park, in conjunction with the knowledge of Minnesota's legislature when it subsequently enacted the state's enabling

legislation. Based on this analysis, the court determined that the "[Minnesota] state legislature had to have known that both the land and the water were necessary features of the proposed park" when it enacted its enabling legislation. *Id.* at 1060. Accordingly, the Eighth Circuit again rejected the argument that the federal government lacked jurisdiction to enforce NPS regulations on park waters—reaffirming its conclusion in *Brown* that Minnesota had ceded to the United States jurisdiction over those waters. *Id.* at 1059–61.

The distinction between the instant case and *Armstrong* and *Brown* is immediately clear: the latter two cases, unlike here, involved *state legislation* ceding jurisdiction to the United States. Specifically, Minnesota enacted legislation ceding jurisdiction to NPS over the lands that became Voyageurs National Park. No such legislation exists here. That alone renders these cases factually inapposite, and in fact fully coheres with the principle that state legislation is required for a cession of jurisdiction.

Nevertheless, the Appellants contend that the fact that *Brown* and *Armstrong* addressed "some [state] legislation regarding federal jurisdiction in Voyageurs misses the point." Defenders' Opening Br. at 33–34; *see* Conservation Ass'n's Opening Br. at 33–35. The state legislation in these cases, they reason, only concerned the *lands* within the park's boundaries—not the *waters* that were centrally at issue in the cases. Consequently, in order "to find a state cession of

43

jurisdiction over the state-owned waters in Voyageurs, the Eighth Circuit had to look" beyond any state legislation, "to other indicia of state intent in the historical record of federal-state negotiations concerning Voyageur's establishment," the Appellants explain. Defenders' Opening Br. at 34. Thus, according to the Appellants, these cases show that "a state [need not] cede jurisdiction to the United States only through statute." *Id.* at 33–34.

We are not persuaded. The Appellants ignore the fact that, in concluding that Minnesota had ceded legislative jurisdiction over both the park lands and waters, both the *Brown* and *Armstrong* courts expressly relied on the Minnesota Legislature's enabling legislation; those courts did not merely "look to other indicia of state intent," *id.* at 34, in divining the scope of Minnesota's cession. *See, e.g.*, *Brown*, 552 F.2d at 820–2l (quoting multiple sections of Minnesota's enabling legislation); *see also Armstrong*, 186 F.3d at 1059–60 (expressly noting that the *Brown* court had "called attention to the enabling legislation passed by the Minnesota Legislature in 1971," before proceeding to discuss that legislation itself). To be sure, they considered this state legislation, in part, in conjunction with the federal enabling legislation. That they examined the state and federal legislation *in pari materia*, however, does not alter the fact that the state legislation itself assumed a necessary role in the court's analysis. At bottom, these cases are fully consistent with the principle that state legislation is

44

necessary for a cession of jurisdiction, and the Appellants' arguments to the contrary are unavailing.

In sum, a cession of legislative jurisdiction requires state legislative action, as evinced by foundational principles of American government as well as caselaw embodying these principles. Thus, if we are to find that Wyoming ceded its legislative jurisdiction to NPS—as the Appellants contend it did—we must find that it did so by an act of the Wyoming Legislature. Any other proffered grounds for finding a cession of jurisdiction are irrelevant as a matter of law.

## 2[9]

Having established the foregoing, we return now to the Appellants' argument that Wyoming ceded its legislative jurisdiction to NPS, thereby according NPS jurisdiction over Park inholdings and rendering § 2.2 applicable to those inholdings. We then turn to the parties' other arguments pertaining to this issue.

The Appellants posit that during the 1949–50 negotiations leading up to the enactment of the Grand Teton Enabling Act, state and federal officials reached a "compromise agreement," "under which no hunting would be allowed anywhere

---

[9]     In light of our holding, we need not, and thus do not, address whether (1) the actual contents of the 1949–50 records demonstrated the existence of any purported cession agreement, *see, e.g.*, NPS's Resp. Br. at 33–37; or (2) whether the United States accepted any purported cession of jurisdiction, *see, e.g.*, *id.* at 37–40.

within the Park's exterior boundaries other than under the Joint Elk Program, regardless of State law." Conservation Ass'n's Opening Br. at 29; *see generally id.* at 29–47; Defenders' Opening Br. at 21–41. This agreement, which they say the 1949–50 records evince, was "tantamount" to a cession of jurisdiction under their reasoning. Conservation Ass'n's Opening Br. at 29, 38 (quoting *Brown*, 552 F.2d at 821). Thus, the Appellants argue that, by "omitt[ing] any consideration" of the 1949–50 record establishing this purported agreement, NPS "entirely failed to consider an important aspect of the problem," thereby rendering its November 2014 decision arbitrary and capricious. Defenders' Opening Br. at 23 (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

The Appellants are mistaken. As we established *supra*, there is only one way in which a state may cede its legislative jurisdiction: that is, through an act of the state legislature. The "agreement" that the Appellants harp on is simply not that. Rather, by the Appellants' own admissions, the agreement is evinced only by the 1949–50 records—which, plainly, do not constitute state legislation; instead, they simply reflect the contemporaneous communications and negotiations between the Wyoming and federal parties regarding the issues underlying the Park's expansion. *See, e.g.*, J.A., Vol. VI, at 1062–64 (Mem. on Jackson Hole Monument Matter); *id.* at 1067–1089. Consequently, not

46

constituting any form of legislative act, the 1949–50 records are irrelevant as a matter of law to the question of whether Wyoming ceded its jurisdiction to NPS.

By necessary implication, then, in rendering its November 2014 decision, the NPS did not act arbitrarily or capriciously by *not* considering the 1949–50 records that purportedly reflected the aforementioned agreement. It is a commonsense tenet of administrative law that an agency is charged with considering only those matters that are *relevant* to the action that it plans on undertaking. The APA clearly embodies this principle—providing that an agency action may be set aside only where the agency, in salient part, "entirely failed to consider an important aspect of the problem" or "failed to base its decision on consideration of the relevant factors." *WildEarth Guardians*, 870 F.3d at 1233 (quoting *Richardson*, 565 F.3d at 704). In other words, so long as an agency has considered those factors or issues that are relevant to its action, the agency has complied with its regulatory mandate, and it cannot be faulted for eschewing consideration of irrelevant matters. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (noting that "agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach"); *cf. W. Watersheds Project*, 721 F.3d at 1275 (holding that "an agency is not obligated to analyze options that it reasonably determines are outside its statutory mandate . . . for a particular action"); *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178,

47

1183 (10th Cir. 2013) (explaining that "agencies need not consider every possible alternative to a proposed action, only 'reasonable' alternatives" (quoting 40 C.F.R. § 1502.14(a))).

As previously discussed, the issue of whether Wyoming ceded legislative jurisdiction over the Park inholdings to NPS solely turns on whether the Wyoming Legislature acted to effect such a cession. The 1949–50 records do not touch on this subject; therefore, irrespective of their contents, they are irrelevant to the resolution of the cession issue. Stated otherwise, the records are irrelevant because they do not evince any lawmaking action by the Wyoming Legislature. As such, in rendering its November 2014 decision, NPS did not act arbitrarily or capriciously by omitting consideration of the 1949–50 records and the ostensible agreement they evince, and we reject the Appellants' contentions to the contrary.[10]

---

[10]    Based on this line of reasoning, we further reject the Appellants' contention that NPS's and Wyoming's arguments regarding the "significance" of the 1949–50 historical records constitute "impermissible post hoc rationalizations," since those arguments "were never articulated by [NPS] itself in the administrative record." *See* Conservation Ass'n's Opening Br. at 45; Defenders' Opening Br. at 21–22. It is well-established that reviewing courts may not accept "counsel's post hoc rationalizations for agency action," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)—a rule that stems from the "simple but fundamental rule of administrative law": "that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(continued...)

[10](...continued)

(1947); *see Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1221 (10th Cir. 2009) ("The court must rely upon the reasoning set forth in the administrative record and disregard post hoc rationalizations of counsel."); *Lewis v. Babbitt*, 998 F.2d 880, 882 (10th Cir. 1993) ("Judicial review under these [APA] standards is generally based on the administrative record that was before the agency at the time of its decision, and reviewing courts may not rely on litigation affidavits that provide post hoc rationalizations for the agency's action." (citations omitted)).

   Here, the fact that NPS's counsel only now addresses the 1949–50 records in these court proceedings, despite having not done so in the administrative record, does not render its arguments on this matter "impermissible post hoc rationalizations." Indeed, as we previously have explained, in considering a proposed action, an agency is charged only with assessing factors that are *relevant* to that action. And, consistent with that mandate, the reasoning that NPS offered when it rendered its November 2014 decision—and which it continues to advance in these court proceedings—is that, in essence, there existed no state statute specifically providing for a cession of Park inholdings. *See* J.A., Vol. V, at 838–39. That reasoning, in other words, is NPS's stated rationale for its agency action. In addressing the 1949–50 records, by contrast, NPS is not now seeking to advance, for the first time in court litigation, some new rationale for its action that it had failed to articulate in the administrative record. Rather, NPS is directly *responding to* the Appellants' argument in this litigation that the 1949–50 records evince a cession of jurisdiction. NPS's mere *response* to this argument—on a matter that, as we have explained, is wholly irrelevant to the issue of Wyoming's cession—does not render the substance of NPS's response a post hoc rationalization. *Cf. Boeck v. Berryhill*, No. 16-C-1003, 2017 WL 4357444, at *16 (E.D. Wis. Sept. 30, 2017) ("It is not 'post hoc' [for the agency official] to respond to an argument made for [the] first time in [the plaintiff's] brief challenging the [agency's] decision."); *Border Power Plant Working Grp. v. Dep't of Energy*, 467 F. Supp. 2d 1040, 1051 (S.D. Cal. 2006) (holding that defendants' declaration responding to information that had been newly introduced by the plaintiff was permissible, explaining that "[w]hat plaintiff characterizes as 'post hoc rationalization' is, in most cases, a response to the information introduced in the [plaintiff's] Declaration"); *Amisub v. Shalala*, No. 94-1883 (TFH), 1995 WL 798910, at *7 n.15 (D.D.C. Dec. 4, 1995) ("The plaintiff challenges the use by the Secretary of various PRM provisions, cost report

(continued...)

**3**

Although we have by now decidedly established that the purported cession agreement embodied in the 1949–50 records could not have itself effectuated a valid cession of jurisdiction, the Appellants have another arrow in their argumentative quiver. Specifically, they contend that if the Wyoming Legislature in fact had to approve the agreement, such approval was granted in 1953, when Wyoming adopted legislation implementing Section 5 of the Enabling Act. *See* Conservation Ass'n's Opening Br. at 38. In so doing, the Appellants assert, the Wyoming Legislature "effectively ratified the agreement." *Id.* at 26.

We reject this argument. Recall that Section 5 of the Grand Teton Enabling Act established a schedule by which the United States was to compensate Wyoming for lost tax revenue resulting from the federal government's acquisition of private lands that were included in the expanded national park. 16 U.S.C. § 406d-3. Wyoming's 1953 statutes implementing Section 5, in turn, provided for

---

[10](...continued)
instructions, and Hospital statistics which were not part of the Secretary's original decision. The plaintiff argues that reliance by the Secretary on materials not previously before the Secretary constitute[s] an impermissible attempt to construct a new administrative record, and as such they are mere post hoc rationalizations due no deference. The Court disagrees. The Court can only assume the plaintiff is not suggesting that it would be entitled to fully brief this issue with all of the sources it could muster, while the Secretary would be limited to those materials 'cited' in the original Decision." (citation omitted)).

the disposition of funds received under Section 5 to the appropriate tax districts in Teton County, where the lands in question were located. *See* WYO. STAT. §§ 36-10-201 to -203.

It should be clear from this description, however, that these state statutes have nothing to do with jurisdiction or hunting. Rather, they merely effectuate the portion of the Grand Teton Enabling Act that reimburses Wyoming for lost tax revenue. The plain language of the statute does not reflect any application whatsoever beyond that, nor can we discern an indication of the legislature's intent to cede jurisdiction over any lands at all in the Park, much less over Park inholdings. Thus, to find that the Wyoming Legislature "ratified" the parties' ostensible cession agreement through the enactment of this legislation would be to subvert the statute's plain language and legislative intent. That we cannot, and will not, do.

Furthermore, we are unable to glean anything from the Grand Teton Enabling Act, 16 U.S.C. §§ 406d-1 to 406d-5, 673c, or in the accompanying House Report, H.R. Rep. No. 81-2910 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3746, that conceivably would have put the Wyoming Legislature "on notice" that, were it to enact legislation implementing Section 5's distribution-of-funds schedule, it would be effectively ceding jurisdiction to manage wildlife on Park inholdings to NPS. *Cf. Armstrong*, 186 F.3d at 1060–61. The Grand Teton

Enabling Act and House Report do not address wildlife management on inholdings or reveal any expectation that Wyoming would cede its legislative power over inholdings. Nor does the Enabling Act or House Report indicate that Congress considered private inholdings—which comprise less than one percent of the Park's total acreage—a "necessary feature[]" of the park. *Id.* at 1060. As a consequence, it is notable that the indicia of congressional intent that factored into the cession analyses in *Brown* and *Armstrong* are also lacking here. For all these reasons, we hold that the Wyoming Legislature's disposition-of-funds statute did not "ratify" any purported cession agreement stemming from the 1949–50 negotiations.

In sum, because the Wyoming Legislature did not authorize any cession of jurisdiction to the federal government over Park inholdings in connection with the 1949–50 negotiations, no valid cession occurred. Accordingly, the 1949–50 records evincing a purported agreement concerning cession are irrelevant as a matter of law. Furthermore, Wyoming's disposition-of-funds statutes did not "ratify" such an agreement. NPS, therefore, did not act arbitrarily or capriciously in rendering its November 2014 decision. We therefore uphold the district court's judgment regarding the November 2014 decision.

## B

## 1

As we have discussed, the Appellants' briefing reflects two overarching challenges to NPS's November 2014 determination that 36 C.F.R. § 2.2 does not apply to Park inholdings. First, both the Conservation Association and Defenders argue that NPS acted arbitrarily or capriciously in determining that it lacked legislative jurisdiction over the Park inholdings—and, as a result, that § 2.2 was inapplicable to Park inholdings. Second, acting alone, Defenders contends that in rendering its November 2014 decision, NPS arbitrarily ignored its independent authority under the Property Clause to protect wildlife on Park inholdings. Having addressed at length *supra* the first ground that the Appellants have raised, we turn now to assessing the second ground that Defenders asserts, concerning the Property Clause.

The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. Although it is well established that Congress possesses broad discretion to determine what regulations are "need[ed]" on its own property, *see Kleppe*, 426 U.S. at 539–40, the scope of its authority over private property is not as clear. Indeed, both the Supreme Court and this court have yet to squarely

53

address to what extent—if at all—the federal government may regulate private property pursuant to the Property Clause. Absent such binding authority, we will assume without deciding, consistent with several of our sister circuits, that the federal government may regulate private property to the extent needed to "protect . . . federal property." *Herr v. U.S. Forest Serv.*, 865 F.3d 351, 356 (6th Cir. 2017) (quoting *Kleppe*, 426 U.S. at 538).

Even under that standard, however, Defenders fails to show that NPS acted arbitrarily in rendering the November 2014 decision, as it has not shown how regulating wildlife hunting on the Park inholdings would be needed to "protect . . . federal property." *Id.* (quoting *Kleppe*, 426 U.S. at 538). Although it speaks in broad strokes about the "threat[] [to] Grand Teton's wildlife" that wildlife killing on the inholdings purportedly poses, Defenders' Opening Br. at 43, Defenders offers no tangible examples of the kind of "threat[s]" that it speaks of—much less does it show that these purported threats are of a sufficiently serious nature so as to render the regulation of wildlife hunting on Park inholdings "needful" for the protection of the federal Park lands. Absent more, we simply cannot conclude that NPS acted arbitrarily in rendering its November 2014 decision.

54

# IV

## 1

We now turn to the second agency action at issue: NPS's approval of WGFD's amendments to the hunt-area boundaries under the 2015 Elk Reduction Program, which was challenged only by the Conservation Association.[11]

Recall that in connection with the 2015 Elk Reduction Program, WGFD amended its boundaries by removing Pinto Ranch from Hunt Area 79 (which was subject to the Elk Reduction Program) and adding it to Hunt Area 70 (which was not subject to the program). Thus, in moving Pinto Ranch from Hunt Area 79 to Hunt Area 70, WGFD effectively removed Pinto Ranch from the Elk Reduction Program—thereby, as relevant here, subjecting that inholding solely to state hunting regulations. NPS subsequently approved WGFD's removing Pinto Ranch from Hunt Area 79 and adding it to Hunt Area 70. It is this action that the Conservation Association now challenges.

Specifically, the Conservation Association argues that NPS's approval of the boundary amendments "was contrary to law because that Program governs all elk hunting inside the Park, including Pinto Ranch and the other inholdings (such

---

[11]    The Conservation Association's challenge to the NPS's 2014 determination that 36 C.F.R. § 2.2 does not apply to the Park's inholdings, for which it does have standing, is addressed in Part III of this opinion.

as another large ranch inholding)." Conservation Ass'n's Opening Br. at 47. The Conservation Association further argues that NPS's approval of the as-amended boundaries was arbitrary and capricious "because it failed to provide any rationale for its action." *Id.*

Whatever the merit of the Conservation Association's claim may be—and the district court found no merit in it—it fails for lack of standing, and it must be dismissed on that basis. We explain why below.

**2**

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Indeed, there is no "case" or "controversy" if a plaintiff lacks standing to sue. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

"It is well established that any party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation, including on appeal." *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008). Furthermore, standing must be established "for each claim," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)), and

56

it "is determined at the time the action is brought," *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007).

To establish the "irreducible constitutional minimum" of standing, *Lujan*, 504 U.S. at 560, a party must prove the following: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *New England Health Care*, 512 F.3d at 1288. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc.*, 136 S. Ct. at 1547.

The Conservation Association cannot satisfy these elements. Our review of its claim is rooted in Section 6 of the Grand Teton Enabling Act, which directs NPS and WGFD to devise a "*yearly plan*" for managing elk "*for that year*." 16 U.S.C. § 673c(b) (emphases added). Pursuant to that statute, NPS and WGFD prepared a "yearly plan" in 2015, wherein they found that "a controlled reduction of elk in [the Park] *in 2015* [was] necessary for the proper management and protection of the elk." J.A., Vol. V, at 886 (emphasis added). To that end, an elk reduction was carried out under the 2015 Elk Reduction Program in certain specified areas of the Park, including in the as-modified Hunt Area 79 (which newly omitted Pinto Ranch).

57

Notably, the 2015 Elk Reduction Program ended on December 13, 2015. *Id.* (providing that "[t]he reduction season in the Park [under the 2015 Elk Reduction Program] shall be open[] October 24 *through December 13, 2015*" (emphasis added)). After that date, in other words, the 2015 Elk Reduction Program was no longer in effect, and would eventually be supplanted by the development of a new "yearly plan" and program for the following year—with this process repeating itself with each successive year. *See* 16 U.S.C. § 673c(b).

In light of the foregoing, the Conservation Association lacks standing to challenge NPS's approval of the 2015 Elk Reduction Program's amended boundaries. Under the governing principles sketched above, to establish standing, a plaintiff must show a "present or threatened injury" at the time the complaint is filed. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998); *see also Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004) (McConnell, J., concurring) ("Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court."). Here, however, NPS approved of the boundary amendments in connection with the *2015* Elk Reduction Program and that program, by its very terms, was in effect solely and specifically for the *2015* year, without force beyond that. It ineluctably follows, then, that NPS's approval of the 2015 boundary amendments did not pose a "present . . . injury" in March

58

2016, at the time that the Conservation Association filed its complaint, much less did it pose a future, "threatened injury" at the time. *Steel Co.*, 523 U.S. at 109. For that reason, the Conservation Association lacks standing to raise this claim. *See, e.g.*, *O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 83–84 (D.D.C. 2011) (holding that plaintiff lacked standing to raise APA claim challenging his 180-day debarment from participation in certain federal government programs that had already expired, "[s]ince plaintiff has not alleged any facts from which the court could infer that there is a likelihood that actual harm . . . could flow from his expired debarment").

Even if NPS's approval of the 2015 boundary amendments had inflicted injury prior to the 2015 Elk Reduction Program's expiration, that would be of no moment, because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive [or declaratory] relief [as here] . . . if unaccompanied by any continuing, present adverse effects." *Facio v. Jones*, 929 F.2d 541, 545 (10th Cir. 1991) (first alteration and omission in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). And, for reasons noted, the Conservation Association cannot show that NPS's approval of the 2015 boundary amendments poses any "continuing, present adverse effects." *Id.* (quoting *O'Shea*, 414 U.S. at 496). Therefore, the Conservation Association lacks standing to raise this claim.

The Conservation Association's arguments to the contrary lack the power to persuade. The Conservation Association suggests that NPS's approval of WGFD's 2015 boundary amendments was predicated on NPS's November 2014 decision that it "lacked the legislative jurisdiction to include [Pinto Ranch, *viz.*, an inholding]," and, therefore, its approval of the 2015 amendments was "not a decision made in 2015 for a single season, to be revisited annually." Conservation Ass'n's Reply Br. at 21. The Conservation Association reasons that the 2015 decision "was as permanent as . . . the [November 2014] decision [upon which it was based]"—as evidenced by the fact that the 2015 amendments to the boundaries of the elk program have been incorporated into the boundaries of the annual elk program every year since the 2015 program. *Id.*; *see also id.* (citing annually adopted state regulations respectively implementing Elk Reduction Programs for the years 2015–2018, all of which incorporated the 2015 boundary amendments). As a result, the Conservation Association concludes, although the 2015 Elk Reduction Program had expired by the time it filed suit, it nonetheless had standing to challenge NPS's approval of the 2015 boundaries, because the impact of that action "was of a continuing nature." *Id.*

We disagree. The specific agency action that the Conservation Association challenges is "NPS's *2015 Agreement* as to the Joint Elk Program." *Id.* at 19 (emphasis added) (bolded font omitted); *see also id.* at 19–20 (contesting NPS's

60

decision to "agree[] to a boundary change *in 2015* which allowed hunting on the Pinto Ranch inholding" (emphasis added)). That is, the Conservation Association contests the specific, discrete action that NPS took *in 2015* to approve the boundary amendments for the 2015 Elk Reduction Program that effectively removed Pinto Ranch from the program—an action that, as we have explained *supra*, plainly ceased having any force and effect when the program expired on December 13, 2015.

The fact that since then, NPS has repeatedly decided in subsequent years to approve those as-amended boundaries, does not render NPS's discrete action in 2015 a "permanent" or "continuing" decision of the kind necessary to prove a present injury for standing purposes. *Id.* at 21. Rather, by the Conservation Association's own representations, NPS's decision to approve the amended boundaries in 2015—and to do so repeatedly on an annual basis thereafter—has been based on its "conclu[sion] that 36 C.F.R. [§] 2.2 does not apply to private land"—that is, it has been based on its November 2014 decision. *Id.* at 20 (quoting J.A., Vol. III, at 553–54).

Therefore, even accepting for purposes of argument the Conservation Association's framing of this issue, it is the rationale underlying the NPS's November 2014 decision, relating to the asserted lack of effect of 36 C.F.R. § 2.2 in inholdings, that is inflicting the continuing or permanent injury of which the

61

Conservation Association complains—*not* the NPS's discrete approval of boundary amendments for an elk program that had expired in 2015 by the time the Conservation Association brought this lawsuit. That is so, even though—as the Conservation Association maintains—the now-expired 2015 Elk Reduction Program fully reflected the rationale of the NPS's November 2014 decision and that allegedly wrong-headed rationale has been repeatedly replicated in the boundaries of subsequent elk reduction programs.

Lest it be overlooked, the Conservation Association could—and indeed did—attack that allegedly erroneous rationale through its challenge to the NPS's November 2014 decision itself. But what it cannot do—consistent with Article III—is extirpate the NPS's November 2014 rationale from the agency's future, annual decisionmaking with respect to the Elk Reduction Program by challenging a 2015 agency action that had, by its plain terms, expired and was of no effect *at the time* its lawsuit was filed. Stated otherwise, the Conservation Association cannot permissibly challenge in a federal lawsuit in March 2016 the 2015 Elk Reduction Program that had expired and ceased to have any effect in December 2015.[12]

_____

[12] The mootness exception for claims that are capable of repetition yet evading review is not applicable to the initial requirement to establish standing at the time the action commences. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at
(continued...)

We, therefore, conclude that the Conservation Association lacks Article III standing to challenge NPS's approval of the boundary amendments implemented in the now-expired 2015 Elk Reduction Program. On this basis, we dispose of this claim, and we do not reach the merits.

## V

For the foregoing reasons, we hold that NPS's determination that 36 C.F.R. § 2.2 does not apply to the Park's private inholdings was not contrary to law or arbitrary and capricious. We therefore **AFFIRM** the district court's judgment upholding this agency action.

We further hold that the Conservation Association lacks standing to challenge NPS's approval of the boundary amendments under the 2015 Elk Reduction Program. We therefore **DISMISS** the portion of the appeal pertaining to this administrative challenge, and **REMAND** with instructions to **VACATE** that portion of the judgment and dismiss the Conservation Association's claim thereof without prejudice.

---

[12](...continued)
the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").